At the election in the county of Northampton, in August, 1838, the defendant voted for members to represent that county in the House of Commons of the General Assembly. He was a native citizen of the State, and an inhabitant of that county; had attained the full age of twenty-one years, had repeatedly paid public taxes, and had resided in the State all of his life, but he had not been an inhabitant of the county of Northampton twelve months immediately preceding the day of election, having removed into that county in the month of November, 1837, from the county of Wake, where he had always theretofore resided. His Honor, upon these facts, was of opinion that the plaintiff was entitled to recover, and gave judgment accordingly, whereupon the defendant appealed.
(405) The question of law arising upon these facts is, whether the defendant had the right to vote at the said election.
The 8th section of the Constitution, upon which the controversy arises, is in these words: "All freemen of the age of twenty-one years, who have been inhabitants of any county within this State twelve months immediately preceding the day of any election, and shall have paid public taxes, shall be entitled to vote for members of the House of Commons for the county in which he resides." The plaintiff insists that this section confines the right of voting to those who have been inhabitants of the particular county in which they reside at the day of election, for twelve months immediately preceding that day; while the defendant contends that a residence within the State for twelve months preceding the day of election — no matter in what county or counties of the State — is sufficient to entitle one, otherwise qualified, to vote for members of the House of Commons for the county in which he resides at the day of election. There is a very striking grammatical inaccuracy in the language of this section, for which it is difficult to account — unless it be that the section does not retain its original form, but in passing through the Congress received some amendments which were so inserted as not to fit in exactly *Page 319 
with its general structure. "All freemen," etc., are entitled to vote for members of the county "in which he resides." It is evident, also, that whichever of the constructions contended for shall be adopted, the intent of the framers of the Constitution will be found not to have (406) been expressed in the most precise terms. These considerations but impress upon us more deeply the propriety of observing the leading rule in the exposition of laws, of assigning to words their popular signification without indulging in critical refinements.
By the plaintiff it is assumed that the obvious sense of the words "any county" is some one county. We do not think so; and no better evidence can be asked to establish the reverse of this proposition than by recurring to other parts of the same instrument, where "any" is annexed to nouns in the singular number. By the 16th section of the Constitution each member of the Council of State is authorized to have his dissent recorded to "any" part of the proceedings of the body. Can it be doubted but that, under this section, he may have his dissent recorded to as many parts of the proceedings as he may disapprove of? In the 19th section the Governor is declared to have power, by the advice of the Council of State, to prohibit the exportation of "any" commodity. In the 23d section officers offending against the State by a violation of "any" part of the Constitution are declared liable to impeachment. By the 25th persons who have been receivers of the public money are rendered ineligible to "any" office until they shall have accounted for and paid into the treasury the sums thus received. In the 27th it is declared that "any" member of the Senate, House of Commons, or Council of State, accepting a certain office, shall thereby vacate his seat. It is needless to multiply instances. In all of them it is manifest that "any" is used in its largest sense as synonymous with "whoever" or "whatever," and as embracing one or more as the case may be.
It is further urged on the part of the plaintiff that if a residence of twelve months within the State be qualification intended by this section, the words "in any county" are superfluous, and may be rejected as unmeaning. Without denying all force to this objection it may, nevertheless, be observed that amid the infinite varieties of style which give character to the expression of thought, the most rare is that which compresses within the smallest compass of words, while it faithfully conveys all that is intended to be communicated. Redundancy of language is so common that it would be hazardous to draw (407) any definite conclusion with much confidence, from the mere use of unnecessary words. On the other hand it is insisted that if the purpose of the section be to require a residence of twelve months within the county where the vote is tendered, the words at the end of the section "for the county in which he resides" are not only superfluous but *Page 320 
inappropriate. They are superfluous, because the sense would be complete without them, and they are inappropriate, for they hold out the idea that the county of residence on the day of election may be different from that in which the previous term of residence has been completed. Upon the whole were we to confine out attention altogether to the words of this section we should probably lean to the construction set up by the defendant, because the other or more rigorous interpretation is not indicated with sufficient distinctness.
But however this might be there are other considerations which tend very strongly to establish the interpretation which we are inclined to adopt upon the words of the section. In the immediately preceding section, prescribing the qualifications of voters for the other branch of the Legislature, the language is: "All freemen of the age of twenty-one years, who have been inhabitants of any one county within the State twelve months immediately preceding the day of any election, and possessed of a freehold within the same county of fifty acres of land for six months next before and at the day of election, shall be entitled to vote for a member of the Senate." If the residence required by the 8th section were the same with that required by the 7th, how are we to account for the marked change of phrase from "any one county" to "any county"? Why is the emphatic and exclusive term "one" used in the 7th section, discarded in the 8th? Again: In the 7th section where "county" is twice mentioned, when it occurs the second time it is described as the "same county." Now, it is exceedingly improbable that in the 8th section, where county is also twice mentioned, the same form of expression would not have been used when the word occurs the second time if the same county were in this section also intended. This striking change (408) of phraseology indicates a change of purpose. It indicates, we think, that for the exercise of the limited franchise of voting for a Senator the Constitution requires not only a freehold, but a residence of twelve months in the county of the freehold, while it gives the more general right of voting for the popular branch of the Assembly to all freemen who have attained full age and have paid a public tax, and have resided twelve months in the State immediately preceding the election; and it provides that this right shall be exercised in the counties repectively [respectively], whereof they may be actually inhabitants at the time when their suffrages are given.
Besides, if the rigorous construction be adopted every citizen who shall have removed from one county to another within twelve months before the election of members of the General Assembly, is, in that election, altogether deprived of a vote. He cannot vote in the county to which he has removed, because he has not been an inhabitant of that county for twelve months immediately preceding the day of election, nor can he vote in *Page 321 
the county from which he has removed, because he is not residing there at the day of election. Now, when we take into consideration that when the Constitution was framed, elections were annual, it can scarcely be believed that this penalty of temporary disfranchisement, consequent upon every removal, was designed to be imposed. In the first place the genius of the Constitution is favorable to the extended right of suffrage, which makes representation go hand in hand with taxation. No removal exempts the citizen from the obligation to pay his tax — and the right of being heard in the disposition of the revenue, to which he has contributed, will not lightly be supposed to be suspended by a change of residence from one side to the other of a county line. Still less should we be disposed to yield to this supposition when we contemplate the known state of things when the Constitution was formed. Population was flowing in a regular and constant tide from the seaboard into the interior; every day new settlements were formed farther and farther towards the West; and new counties were springing up almost every year as the Indians retired and the white man advanced into the more distant recesses of the forest.
The requisition of a previous residence of any duration in the (409)county where the suffrage should be offered, was wholly unknown under the colonial government. The oath which the freeholder (for none but freeholders could then vote) was required to take, if his qualifications were disputed, is given in Davis's Revisal, page 248. "You shall swear that you have been six months an inhabitant of this Province; and that you have been possessed of a freehold of fifty acres of land for three months past in your own right, in the county of ______; and that such land hath not been granted to you fraudulently, on purpose to qualify you to give your vote; and that the place of your abode is in the county of ______; and that you have not voted in this election." A previous residence of six months within the province provided the person offering to vote had the requisite freehold qualification, entitled him to vote in the county which was the place of his abode on the day of election. The Constitution hath very clearly substituted the payment of a public tax for the freehold qualification, and required a residence of twelve, instead of a residence of six, months, but that it has introduced an entirely new qualification, a previous residence exclusively within the county in which the voter has his abode on the day of election, ought distinctly to appear, before we can presume it to have been intended.
Certain considerations of public policy have been suggested in the argument of the plaintiff's counsel as having probably operated on the minds of the framers of the Constitution, so as to induce them to require, and which should influence the judgment of the expounders of the Constitution in construing it, to require this exclusive and continued *Page 322 
residence as one of the qualifications of the voter. It has been said that, without it, the voter cannot be supposed to have acquired that knowledge of the peculiar interests of the county, or that acquaintance with the character, talents and political views of the candidates for his suffrage, as to enable him to aid in selecting a fit representative of the county. Arguments of this kind, though undoubtedly admissible, are to be listened to with caution. The interpreters of a law have not the right to judge of its policy, and when they undertake to find out the (410) policy contemplated by the makers of the law there is great danger of mistaking their own opinions on that subject, for the opinions of those who had alone the right to judge of matters of policy. Now what is there upon which we can ground anything like a confident belief that the considerations now urged upon us had the weight with the framers of the Constitution supposed in this argument? Whether strong or weak they are obvious considerations, and could scarcely have escaped notice. Is it absurd to suppose that when thus presented to notice, they were met by other considerations of policy, which in their judgment, outweighed them? Might not the Congress have thought that in a State almost exclusively agricultural, where the occupations in one county were the occupations in all the counties, a residence of twelve months within the State was sufficient to give the citizens that knowledge of its general interest, to excite that sympathy for the common weal, and to afford that acquaintance with the principles and talents of the candidates for popular favor, as to render it unwise to stifle altogether the voice of him who had divided his residence between two or more counties? Such, beyond question, was the opinion which had been generally entertained up to the time of framing the Constitution, and without some evidence, we are not to presume that this opinion was then abandoned. But, in truth, the evidence, if any, is all the other way. Before the Revolution there had been conferred on certain towns a distinct right of representation in the legislative body, and this privilege, to a certain extent, was preserved and secured by the Constitution. The avowed purpose for granting this special franchise was for that the inhabitants of these towns, because of their peculiar pursuits, were supposed to have important interests, distinct from those of the great body of the community, which required the protection of representatives selected exclusively by them. Now, when the Constitution defines the qualifications of a voter in one of these towns it explicitly declares that he shall either have a freehold in and be a resident thereof at the day of election, or "shall have been an inhabitant of such town twelve months next before (411) and at the day of election;" thereby unequivocally manifesting that, in regard to these municipalities, having peculiar interests, it was designed that the voter should have that connection and *Page 323 
sympathy with these interests as would induce him to prefer a fit representative of them. Thus we see that when the framers of this instrument deemed an exclusive residence of a determinate duration, within the limits of a particular town, an essential qualification for a voter in that town, they declared this purpose in express terms, and the inference is almost irresistible that such purpose would have been as plainly declared, with respect to the voters in a county, if, in regard to county representation, that purpose had been entertained. Expression unius estexclusio alterius.
It may not be amiss to remark that by a residence in the county the Constitution intends a domicil in that county. This requisition is not satisfied by a visit to the county, whether for a longer or a shorter time, if the stay there be for a temporary purpose, and with the design of leaving the county when that purpose is accomplished. It must be a fixed abode therein, constituting it the place of his home. This residence or domicil is a fact not more difficult of ascertainment, when required as the qualification of a voter, than residence or domicil at the moment of a man's death, which is so important in regulating the disposition and management of his estate after death.
It has been urged that there is more room for the commission of frauds if the liberal construction insisted on by the defendant be adopted than there would be if the rigorous construction contended for by the plaintiff were established. The correctness of this remark is admitted. There is not the same facility in feigning with success a continued residence of twelve months in a county, as in falsely pretending a residence on the day of the election — nay, it may be, when a general election throughout the State takes place in neighboring counties on different days that, by a change, or a pretended change of residence between these different days, the fraud may be practised of voting twice at the same election. But the remark is of little weight as an argument to show what is the qualification actually required by the Constitution. It proves only that the more the elective franchise is fettered by restrictions the more difficult becomes the usurpation of (412) it by those not entitled — but it neither proves nor tends to prove that because of such difficulty the franchise is to be restrained by construction where it is not clearly restrained by the Constitution. The sole inquiry is, what are the limits there imposed upon it? and it is the proper business of legislation to prevent those abuses of fraud or violence, to which all that is valuable here below is necessarily exposed. In the discharge of this duty the Legislature has provided that every person tending a vote at any election may be required to swear that he has not previously voted in that election, and that he possesses the qualifications required of a voter by the Constitution; and it has also imposed penalties on those *Page 324 
who may vote contrary to law. If these provisions, and those securing impartial judges of elections, should prove ineffectual it is not to be doubted but that other and more efficacious provisions will be devised to meet the mischiefs disclosed by experience.
We believe that, in truth, frauds in elections are not often committed with us. There has been, we understand, some difference of opinion in a few of the counties in relation to the question now under consideration, which has produced an unsteadiness of practice, which, in moments of strife and excitement is too readily ascribed to corrupt motives. The general opinion and the general practice have, undoubtedly, however, been in conformity with what we understand to be the true meaning of the Constitution. That meaning, once fully settled and generally known, there is great cause to hope that neither fraud nor mistake in relation to this subject will prevail to any very injurious extent. It is the opinion of this Court that the judgment of the Superior Court ought to be reversed with costs.
PER CURIAM. Judgment reversed.
Cited: Lawrence v. Pitt, 46 N.C. 349; Hannon v. Grizzard, 89 N.C. 120;Fulton v. Roberts, 113 N.C. 428.
(413)